## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| DR. DOUGLAS R. TIGHE<br>347 South Drive<br>Severna Park, Maryland 21146<br><br>    Plaintiff,<br><br>       v.<br><br>BAE SYSTEMS TECHNOLOGY<br>SOLUTIONS & SERVICES, INC.<br>1601 Research Boulevard<br>Rockville, Maryland 20850<br><br>Serve:  The Corporation Trust Incorporated<br>         351 West Camden Street<br>         Baltimore, Maryland 21201<br><br>    and<br><br>BAE SYSTEMS, INC.<br>1101 Wilson Boulevard, Suite 2000<br>Arlington, Virginia 22209<br><br>Serve:  The Corporation Trust Incorporated<br>         351 West Camden Street<br>         Baltimore, Maryland 21201<br><br>    Defendants. | Case No. 1:14cv2719 |

## AMENDED COMPLAINT

COMES NOW THE PLAINTIFF, DOUGLAS R. TIGHE, by counsel, and moves this

Court for entry of judgment in his favor, and against the Defendants, BAE SYSTEMS

TECHNOLOGY SOLUTIONS & SERVICES, INC. and BAE SYSTEMS, INC., and in support

of such complaint alleges and avers as follows:

## NATURE OF ACTION

1.      This is an action of law arising out of the conduct of the Defendants, BAE Systems Technology Solutions & Services, Inc. ("BAE TSS") and BAE Systems, Inc. ("BAE Inc.") in the course of the employment of the Plaintiff, Douglas R. Tighe.

2.      This action states a claim under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34 (the "ADEA"), and a claim for breach of contract, against the Defendants, BAE TSS and BAE Inc. (collectively known as "BAE Systems").

## PARTIES

3.      Plaintiff Douglas R. Tighe ("Dr. Tighe") is a resident of the State of Maryland.

4.      At all times material hereto, Dr. Tighe was employed by BAE TSS.

5.      Dr. Tighe is currently 68 years of age (he was 66-67 at the time of the events complained of herein). At all times relevant to these claims, Dr. Tighe was more than 40 years of age.

6.      BAE TSS is a Delaware corporation in good standing, with offices in the District of Maryland, including during the time of the events described in this Complaint.

7.      BAE TSS has had 20 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year of Dr. Tighe's discharge.  BAE TSS is an "employer" within the meaning of 29 U.S.C. § 630(b).

8.      BAE Inc. is a Delaware corporation in good standing, with its headquarters in Arlington, Virginia, and registered to do business in the District of Maryland, including during the time of the events described in this Complaint.

9.      BAE Inc. has had 20 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year of Dr. Tighe's discharge.  BAE Inc. is an "employer" within the meaning of 29 U.S.C. § 630(b).

## JURISDICTION AND VENUE

10.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

11.     The causes of action alleged in this action arose in the District of Maryland.

12.     During the time when BAE TSS was Dr. Tighe's employer, including the time when the events described in this Complaint occurred, BAE TSS was located in the District of Maryland. This Court has jurisdiction over Dr. Tighe's claims under the ADEA pursuant to 29 U.S.C. § 626(c)(1).

13.     BAE TSS is present in, has offices in, and regularly conducts business in the District of Maryland, including during the time period in which the events giving to the claims described in this Complaint occurred.

14.     In addition to BAE TSS residing in the District of Maryland, including during the time of the events described in this Complaint, a substantial part of the events or omissions giving rise to the claims described in this Complaint occurred in the District of Maryland. Accordingly, venue is proper in this Court under 28 U.S.C. § 1391(b).

15.     BAE Inc. is headquartered in Arlington, Virginia and is registered to do business in the District of Maryland.  This Court has jurisdiction over Dr. Tighe's claims under the ADEA pursuant to 29 U.S.C. § 626(c)(1).

16.     Venue is proper in this Court as to BAE Inc. under 28 U.S.C. § 1391(b).

17.     Because the breach of contract claim described below (Count Two) is so related to the ADEA claims described below (Count One) and form part of the same case and controversy, supplemental jurisdiction over the breach of contract claim (Count Two) is provided by 29 U.S.C. § 1367(a).

18.     Both BAE TSS and BAE Inc. share the same registered agent in the District of Maryland.

## PROCEDURAL STATUS

19.     Dr. Tighe filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on October 30, 2013, alleging age discrimination.

20.     Dr. Tighe received in the mail a right to sue notice from the EEOC shortly after the date of the notice, which was dated May 29, 2014.  Dr. Tighe filed this Complaint within 300 days of when he received the right to sue notice.  Dr. Tighe has exhausted his administrative remedies.

## BACKGROUND

21.     Dr. Tighe is 68 years old.

22.     Dr. Tighe is a Vietnam-era Veteran with over 40 years of leadership experience and successful, measurable senior management accomplishments in the Federal defense, intelligence, and space markets. Dr. Tighe has a rare and useful versatility in terms of breadth of experience and capability across the fields of engineering management, profit/loss accountability, program management, business development, and corporate governance.

23.     Dr. Tighe was employed by BAE Inc. from 2004-2013, most recently by its Technology Solutions & Services, Inc. company, BAE TSS.

24.     BAE Inc. is the US subsidiary of BAE Systems, plc, a British-owned global defense, aerospace, and security company.

25.     Dr. Tighe was classified as a "key" and "highly compensated" employee, based on his level of remuneration, and consistent with Federal IRS regulations.

26.     Dr. Tighe is highly qualified and excelled throughout his career with BAE Systems and his prior employers – Lockheed Martin, General Dynamics, the US Air Force, and the Central Intelligence Agency. His leadership skills have regularly exceeded those of his peers, as evidenced by his progressive increase in responsibilities, business growth achievements, customer relationships, program management accomplishments, his internal performance evaluations and his Behavioral Performance Feedback and Total Performance Leadership (TPL) 360 results, both prior to and during the full duration of his United Kingdom (UK) assignment, which began in June 2009 and ended in June 2013.  His 2012 performance in the UK was typical of his sustained high level of performance and was characterized in his annual Performance Development Review by Mr. Peter Fielder ("Mr. Fielder"), Managing Director Performance Excellence (Dr. Tighe's supervisor for 4 years in the UK), as his "best year thus far."

27.     Dr. Tighe's academic background strongly supports his technical and management assignments as he earned a Ph.D. in Aerospace Engineering Sciences from the University of Colorado at Boulder, a M.S. in Applied Physics from the Johns Hopkins University, and a B.A. in Physics from Lafayette College.

28.     Dr. Tighe has been awarded several BAE Systems Chairman's Awards, recently earned the Chartered Engineer credential in the UK by its national Engineering Council (equivalent to the Professional Engineer credential in the US), and was honored to be nominated

and accepted as a Fellow with the UK's Institute of Engineering and Technology for his career accomplishments in the engineering and management fields.

29.    Dr. Tighe's experience, qualifications, and management capabilities are comprehensive by any standard, and are well supported by his past accomplishments and consistent contributions to his employers' business objectives.

30.    From June 2009 through his repatriation date of June 30, 2013, Dr. Tighe was a Global Grade-17 (Vice President/General Manager-II) with BAE Systems.  He held worldwide responsibility for the company's corporate governance framework as its Head of Business Management Systems.

31.    Dr. Tighe was seconded (on an extended loan) from BAE Systems' Support Solutions (S2) Sector in the US to the Office of the Chief Executive Officer ("CEO") in the United Kingdom.  After a search for a qualified candidate across the global company, Dr. Tighe emerged as the single preferred candidate from BAE Inc.'s US-based subsidiary for this UK role. Based on input he received from John Reing (Vice President of Human Resources for the S2 Sector in 2009) and the hiring director in the UK, Mr. Fielder (the Managing Director of Performance Excellence), this was a developmental and rotational assignment.

32.    Dr. Tighe's UK assignment was initially set for two years, beginning in June of 2009, but was extended twice, each time by one-year increments. These extensions were based on superior performance, recognition of the numerous collaborations Dr. Tighe helped enable between the UK and US elements of BAE Systems, and the stated desires of his supervisor (the Managing Director Performance Excellence) and Ian King ("Mr. King"), the CEO of BAE Systems, plc, that Dr. Tighe continue in his UK role.

33.    Dr. Tighe's assignment in the UK was ultimately scheduled to end in late June 2013, and he planned to end the loaned arrangement which had been in place for four years and to transition back to his home business in the US (the S2 Sector) and work for at least five more years, and then retire at age 72 in July 2018.

34.    Dr. Tighe's employment contract with BAE Systems for his UK assignment states, in relevant part:

> "[A]t the end of your assignment, BAE Systems *will make every effort to assist you* in identifying a suitable position for which you may apply to continue your career with the company...if no suitable position is available...your employment with the company will be terminated."
> [Emphasis added]

BAE Systems therefore had a contractual obligation to provide "every effort" to assist Dr. Tighe in obtaining a new position with BAE Systems after the conclusion of his UK assignment.

35.    As early as the beginning of 2012, approximately 18 months in advance of his ultimate repatriation on June 30, 2013, it became clear to Dr. Tighe that no one at BAE Systems in the US was planning to provide him with meaningful proactive assistance in finding a new position with BAE Systems, and that on his own he personally needed to find a new position with BAE Systems in the US to assume upon his repatriation, in order to remain employed by BAE Systems (which was his strong preference). Recognizing this, Dr. Tighe began his search for a US-based leadership role with BAE Systems more than 18 months in advance of his ultimate repatriation date.

36.    Over this 18 month interval, Dr. Tighe consistently expressed his interest to BAE Systems' leadership in the US that he wanted to return to an appropriate executive position with BAE Systems in the US.  He communicated to them his willingness to accept a return role anywhere in the continental US.  He also arranged with his UK supervisor for an early return to

the US, if needed, once he found an appropriate job to return to. His intent in this was to offer

BAE Systems maximum flexibility in where he was willing to work and how responsively he

could arrange his repatriation to meet the timing needs of a new job in the US.

37.     In the last year and a half of Dr. Tighe's employment with BAE Systems, and

while he was overseas, he actively searched for continuing employment within BAE Systems,

identified a significant number of suitable US-based positions, and formally applied for nearly

two dozen positions with BAE Systems, all of which he was well qualified to assume. There

were numerous other jobs at or near his grade which he did not have the qualifications to assume,

and he did not apply for any of those. However, a consistent and concerning pattern emerged of

being rejected for the jobs he was very well qualified for and had applied for.

38.     During this 18 month interval, there was essentially no pro-active effort on the

part of BAE Systems – certainly not "every effort" – to assist Dr. Tighe in his job search

consistent with the company's contractual obligation to him to provide that level of support.

Managers and executives from BAE Systems did participate in some job-search meetings, but,

without exception, these were meetings which Dr. Tighe took the initiative to set up. Over the

18 month period of internal job searches, there was essentially no follow-up, or direct feed-back

to Dr. Tighe, on the part of these BAE Systems executives and managers following these

meetings.

39.     For the vast majority of the nearly two dozen positions Dr. Tighe applied for, he

was not even invited to interview, despite his highly competitive qualifications for each position.

For many of these positions, he never received any feedback on why he was being rejected – the

only item being received was a computer automated email which acknowledged his on-line

posting for the particular job. For some of these positions, Dr. Tighe submitted, along with his

8

resume, detailed comparisons of his capabilities and relevant experience to the stated requirements of the position, which made clear how well qualified he was for those positions. Nevertheless, he was not offered a single position, and was not even given the opportunity to interview for the vast majority of them. Dr. Tighe strongly suspected that, but for his advanced age, he would have been selected, and should have been selected, for at least one of these positions; indeed, for the majority of them given his qualifications, expertise, experience, and accomplishments.

40.     As a result, Dr. Tighe was involuntarily terminated on July 8, 2013, because he did not obtain a new position at BAE Systems after his return to the US. Prior to July 8th, Dr. Tighe twice requested a short interval of paid leave time following his June 30th repatriation date, but in advance of his pending termination, to continue his internal job search as an active employee. Despite prior precedent of the company granting such paid leave to executives returning from international assignments, the company denied both of Dr. Tighe's requests.

**Vice President of Internal Audit Position**

41.     One position which Dr. Tighe applied for, which he was exceedingly well qualified for but which he was not offered, was BAE Inc.'s Vice President of Internal Audit, a Global Grade-17 role, which he applied for on October 23, 2012. Dr. Tighe successfully completed a preliminary interview, but was not invited to participate in the final interview process, despite having provided Mr. Gray, BAE Inc.'s Senior Vice President of Human Resources and Administration, with a detailed comparison and complete alignment of his unique qualifications to each stated qualification of the position, both before and during the preliminary interview with Mr. Gray. At his preliminary interview, Mr. Gray stated he had not seen this summary. Dr. Tighe then provided Mr. Gray with a copy, but never received any indication

whatsoever that BAE Inc. actually utilized the compelling information in these comparisons as they considered his application for this Internal Audit position.

42.     Mr. Gray notified Dr. Tighe on January 7, 2013 that he was not being selected for a final interview. Dr. Tighe then wrote to Mr. Gray inquiring as to why he was not invited to the final round of interviews, given his clear and unmistakable qualifications for the position. Mr. Gray responded:

> "We have concluded the down-select process for the Internal Audit role. Unfortunately you were not selected to proceed in the process. You did a fine job in the interview so there were no issues there. If we were only filling the Internal Audit role, I think you would have made the down-select. But, as you know this is a developmental rotational assignment, so we have to fill this role *and factor in a view as to what the next role would be.* We interviewed ten qualified candidates from throughout the Inc. business and had to differentiate somehow – *and future assignment potential was as [sic] tie breaking factor.* I am sorry this did not work and am happy to discuss it further." [Emphasis added]

43.     Dr. Tighe was 66 years old at the time he was eliminated from consideration for this Internal Audit role.  But for his age, he would have been selected for this position for which he was exceptionally qualified – well beyond any other applicant.

44.     The "tie breaking factors" that decided whether or not Dr. Tighe was selected for the position were evidently how he would benefit from assuming the role, whether or not there would be a "next or follow-on role" for him at BAE Inc., and his lack of "future assignment potential," which are clear references to his advanced age.

45.     Following Mr. Gray's disappointing email response, Dr. Tighe requested a meeting to seek further feedback from Mr. Gray.  In this meeting, Mr. Gray further characterized Dr. Tighe's situation as being impacted by his lack of "future potential" to the company.  Dr. Tighe expressed concern to Mr. Gray over the emerging pattern of being rejected for positions which he was very well qualified to fill.  Dr. Tighe asked Mr. Gray if he felt that Dr. Tighe had stayed in his UK assignment too long, and was suffering from an "out of sight, out of mind"

situation. Mr. Gray responded that it was actually a situation of Dr. Tighe being "out of sight,

out of phase." Again, these are code words and phrases that reference Dr. Tighe's age. Dr.

Tighe found these phrases quite startling, since they clearly implied to him that his extensive

experience and capabilities and his documented superior past performance were being ignored,

and BAE Inc. rather was focused on his age, the limited number of pre-retirement years left in

his career, and an apparent conclusion that he had no usefulness left relative to the company's

current business plan. Again, but for his advanced age, Dr. Tighe would have been selected for

the Internal Audit role.

46.    When Dr. Tighe was asked about potential future roles during the interview, he

was able to identify how this rotational/developmental position would have been beneficial to

prepare him for subsequent leadership roles within the company, thus continuing his career

development and contributions to BAE Inc.'s performance and achievement of its business goals.

He gave a comprehensive answer to Mr. Gray and, by telephone, to Mr. Lyle Vines (together

comprising his "interview panel"), which clearly identified several significant benefits (both

personal and to the company) and a range of more than two dozen possible next leadership roles

for which Dr. Tighe would have been better prepared for assuming he had been in the Vice

President of Internal Audit role for the intended two years. In response to Mr. Gray's question,

Dr. Tighe also expressed a willingness, which matches his prior career and assignments with

BAE Systems, to take whatever role from this large set of possible assignments would best serve

the company's needs at that time.

47.    Despite Mr. Gray's earlier written feedback to Dr. Tighe that he had done "fine"

in the screening interview with "no issues," BAE Inc.'s claims that Dr. Tighe was unable to

answer the "future assignment" interview question dealing with how he would benefit from the

internal audit assignment and what he envisioned for his subsequent assignment. This is obviously untrue and inconsistent with Dr. Tighe's comprehensive answer and with Mr. Gray's earlier feedback.

48.     In contrast to this, Dr. Tighe learned that Nick Ruscio ("Mr. Ruscio"), who was ultimately selected to fill the Vice President of Internal Audit position, and is believed to be in his forties, provided a supposedly better response to this question, saying that he would want to assume a subsequent role leading finance in one of BAE Inc.'s sectors – including at the company level as CFO.   However, at best, Mr. Ruscio's response identified a very small number of potential future positions.  Indeed, BAE Inc. subsequently combined the S2 Sector with its Land & Armaments Sections, and based on this action, there are only four such finance leadership positions in all of BAE Inc.  By contrast, Dr. Tighe identified more than two dozen possible future leadership assignments for himself.

49.     Moreover, Mr. Ruscio's background is predominantly financial, and his prior role in BAE Inc. was that of an ethics officer. The breadth of Dr. Tighe's directly applicable background, with particular emphasis on his last four years holding global responsibility for BAE Systems, plc's corporate governance framework (in which comprehensive experience was an emphasized requirement of the position's online job specification), far exceeded Mr. Ruscio's.  In his UK role, Dr. Tighe annually reviewed proposed content for BAE Systems, plc's global audit plan, including the planned audits for the US company.  The range of topics covered in these annual plans consistently was wide (and well beyond just finance) – including project management, engineering, manufacturing, customer relationships, compliance with policy and core business process mandates, compliance with local and federal law, business development

approaches and finance. Dr. Tighe's broad experience and capability base were far more relevant than was the limited background that Mr. Ruscio offered.

50.   The Vice President of Internal Audit job specification noted a Required Skill:

> Thorough understanding of the company's four interlocking elements that together comprise the company's system of internal controls – Operational Framework, Core Business Processes, Operational Assurance Statement and audit's role in assessing effectiveness of controls. Depending on familiarity with these elements, it could take 10 to 18 months to learn them.

At the worldwide level across all elements of BAE Systems, plc, Dr. Tighe was the accountable executive for exactly this system of internal controls for four years.  He had significant background in these four governance elements prior to his UK assignment, but further developed an exceptional level of expertise in and understanding of this corporate governance framework due to his four year UK assignment of Head of Business Management Systems.  No other candidate could have offered this level of understanding and experience on Day One of this next assignment as Vice President of Internal Audit.  No "on the job" learning curve of up to 18 months would have been required – allowing Dr. Tighe to be highly effective in this role immediately after assuming it.  Dr. Tighe also had held principle accountability for recent modifications, enhancements and updates to the overall governance framework – giving him very current knowledge of these changes – and a valuable understanding of the rationale for the changes.  However, Dr. Tighe's unrivaled level of experience relative to the job specifications was ignored in the company's selection process, and his advanced age led to a negative selection decision.

51.   Uniquely matching another Key Role & Responsibility included in the Vice President of Internal Audit job specification, Dr. Tighe also offered an established and very positive working relationship with Andrew Gallagher ("Mr. Gallagher"), who is the UK-based

audit director for worldwide BAE Systems, plc.  Developing and utilizing such a relationship was also a stated requirement in the job specification.  No other candidate, in particular Mr. Ruscio, could have offered such an existing extended relationship with Mr. Gallagher, who upon learning that Dr. Tighe had applied for the role, told Dr. Tighe that he would have been very pleased to have Dr. Tighe assume the role.

52.      Dr. Tighe had also worked quite successfully over four years with many of Mr. Gallagher's Heads of Audit assigned across BAE Systems, plc.'s international companies, and business areas – including auditors from the US company.  These extensive and positive relationships offered high value to the US company, and no other candidate offered anything close.  During his four year UK assignment, Dr. Tighe also frequently contributed to audit planning, reviewed in detail almost every global and UK audit report produced, and accomplished closure of numerous audit findings.  Based on his four years of extensive work within BAE Systems, plc's internal corporate audit environment, Dr. Tighe gained exceptional experience relevant to the Vice President of Internal Audit position.  Yet, this unique range of qualifications offered by Dr. Tighe was inexplicably ignored.

53.      During his preliminary interview with Mr. Gray, Dr. Tighe was told that Mr. Gallagher would participate in the final selection process – along with Linda Hudson (CEO of BAE Inc.).  Dr. Tighe subsequently learned, after the selection of Mr. Ruscio, from Mr. Gallagher that had he not been asked to participate in the final selection, but was merely told who the selected candidate was.  At the time of announcing Mr. Ruscio as the selection, Mr. Gallagher told Dr. Tighe that he had never met – or even talked to – Mr. Ruscio.

54.      Across each and every element of the Vice President of Internal Audit job specification, Dr. Tighe was significantly better qualified for this position than Mr. Ruscio, or

indeed than any of the other candidates being considered.  Nevertheless, the Vice President of

Internal Audit position was given to Mr. Ruscio.  But for his age, Dr. Tighe would have received

this position.

### Global Grade – 18 S2 Sector Deputy Position

55.     An additional position that Dr. Tighe applied for, was well qualified for, and yet

was not selected for, was BAE TSS' Global Grade-18 Deputy for the S2 Sector, working directly

for the sector president.

56.     When Dr. Tighe saw this position in the internal jobs system, he was very

interested in it, immediately applied for it online, and received automated confirmation that his

application had been received.

57.     Since he had not met the new S2 President, Erin Moseley ("Ms. Moseley"), he

took the initiative to arrange an introductory meeting with her, taking advantage of a business

trip to the US that he had already set up for other purposes.  Dr. Tighe's meeting with Ms.

Moseley went very well. They discussed her priorities for the role, which would report directly

to her, and Dr. Tighe's experience and qualifications for the role.  The alignment of Dr. Tighe's

experience and qualifications with Ms. Moseley's priorities –  in the areas of earned value

management, cultural alignment, profit/loss accountability for services contracts, business

growth, improved program management, cost/rates management, and tailoring of corporate

governance mandates to a services-type business – was extremely positive.

58.     Prior to this meeting, Dr. Tighe served as the accountable executive for a highly

successful year-long governance improvement and simplification project to update, publish, and

globally distribute a comprehensive revision of one of BAE TSS's Core Business Processes, the

project management Lifecycle Management Framework (LCM), which significantly

strengthened, yet simplified, LCM's applicability to the capture and management of its services-type proposals and contracts. This accomplishment of Dr. Tighe's was directly relevant to the S2 Sector's pursuit of and performance on a growing range of services-type programs. And, it aligned, directly and compellingly, with one of Ms. Moseley's priorities for her deputy.

59.     In their discussions, Ms. Moseley acknowledged the positive aspects of this alignment of Dr. Tighe's background and capabilities to her priorities for the role. Dr. Tighe asked Ms. Moseley where the job would be based and when she planned to fill it. She responded that it would be based at her offices at 80 M Street, in Washington, DC, and that she hoped to fill the role very soon. Dr. Tighe told her that he was very interested in the role, felt very confident that with his prior experience and current qualifications/capabilities he could do the role very well (and could help make her successful), would be pleased to work at her DC location, and could arrange a repatriation date which would meet her needs.

60.     Beyond the S2 Deputy position, Ms. Moseley also mentioned that she was considering Dr. Tighe for other leadership roles in her sector. One specific role she mentioned was working in Fort Walton Beach, Florida with Gordon Eldridge, in her Aerospace Solutions business unit. Further, Ms. Moseley gave Dr. Tighe the impression that there were other positions also being considered. However, as Dr. Tighe's termination date approached, he was told by Michelle Murphy ("Ms. Murphy"), the Vice President of Human Resources for the S2 Sector, that there were no available positions for him in S2. Despite receiving an email from Ms. Mosley's executive assistant indicating they were planning to interview him for the deputy role, he was later informed that he would not be interviewed for the S2 Deputy position, since that role, he was told, had been cancelled.

61.     During the last portion of Dr. Tighe's meeting with Ms. Moseley, when he discussed with her his intention to retire in 5 years at age 72 in July 2018, she commented on his "short runway" situation – a phrase which clearly referred to Dr. Tighe's age.  Dr. Tighe left the meeting with the strong impression that this viewpoint would limit his options with BAE TSS in terms of further employment.

62.     At the end of Dr. Tighe's meeting with Ms. Moseley, they discussed whether she had gotten a reference from several US-based BAE Systems executives that, prior to this meeting, Dr. Tighe had recommended she speak to.  Ms. Moseley told Dr. Tighe that she had gotten an exceptionally positive recommendation from Jake Gatch ("Mr. Gatch"), the Vice President of Management Business Systems in the US company, and had also received a positive recommendation from Douglas Belair ("Mr. Belair"), Senior Vice President of Strategy and Planning for the US company, and Dr. Tighe's former supervisor before he started his UK assignment.

63.     Ms. Moseley said she had not yet talked to Michael Bennett ("Mr. Bennett"), CIO for the US company, or John Gannon ("Mr. Gannon"), the retired former President of the Intelligence & Security Sector of the US company, but said that she planned to speak to both of them.  Dr. Tighe then told her that two UK executives, Ian King ("Mr. King"), CEO of BAE Systems, plc, and Mr. Fielder also wanted to provide her with positive recommendations, but that, due to the Special Security Agreement in place between BAE Systems and the US Department of State (dealing with foreign ownership and influence), she would need to call them as they would not be able to call her.  Ms. Moseley agreed to contact both of them.  However, Dr. Tighe never received any indication that she did talk to or do any follow-up with Mr. Bennett, Mr. Gannon, Mr. King, or Mr. Fielder.

64.     In an email that Dr. Tighe received from Ms. Moseley's personal assistant, he was told that they were planning to arrange an interview for him for this Deputy role.  The job posting remained active through Dr. Tighe's repatriation and past his termination, but he never heard anything back regarding his application, nor was he offered an opportunity to interview.

65.     Later, after Dr. Tighe's involuntary termination, he was told by Ms. Murphy that BAE TSS was not yet ready to fill the Deputy position, despite it having been an active posting for several months and Ms. Moseley's direct input to Dr. Tighe that filling the job was a near-term priority for her business.  Ms. Murphy said that although Dr. Tighe had been terminated, they would still consider interviewing him once the interviewing started.  There was subsequently no follow-up from Ms. Murphy about this offer.

66.     After his July 2013 termination, Dr. Tighe was told by Ms. Murphy that the S2 Deputy position would not be offered to him, and was later told that the position had been cancelled.  On information and belief, based on Dr. Tighe's successful introductory meeting with Ms. Moseley, a decision was made that, despite his strong qualifications, availability, and high interest, BAE TSS declined to offer him the role because of his advanced age despite there being a genuine need for someone to assist Ms. Moseley in this deputy role in managing her business and Dr. Tighe being very well qualified to fill this position.  Instead, BAE TSS canceled the position to avoid giving the role to Dr. Tighe, who had demonstrated his excellent qualifications for the role.

67.     These two leadership positions for which Dr. Tighe was passed over – the Vice President of Internal Audit at BAE Inc. and S2 Sector Deputy at BAE TSS – were just two out of a total of nearly two dozen positions which Dr. Tighe formally applied for, and serve as clear examples of age discrimination. With respect to the Vice President of Internal Audit and S2

Sector Deputy positions, and supported by similar rejections for almost two dozen other positions which Dr. Tighe applied for and was qualified to fill, but for his age, Dr. Tighe would have been, and should have been, selected as the most qualified candidate.

### Related Forms of Age Discrimination and Breach of Contract

68.    BAE Systems also further discriminated against Dr. Tighe by intentionally excluding him from a placement option contained in BAE Systems's normal policies for employees in certain situations like his to be placed directly into next assignments at BAE Systems without going through BAE Systems's job posting process. This was done at a time when this policy option was being used for other current US-based employees who did not appear to meet the option's three application criteria listed below, while Dr. Tighe met all three.

69.    BAE Systems' actions made it much more difficult for Dr. Tighe to even apply to new positions at BAE Systems.  About 18 months before the end of Dr. Tighe's UK assignment, Mr. Gray informed him that, when he was searching for a new position at BAE Systems, he would have to post for all positions he was interested in (using their internal jobs posting system).  BAE Systems' Performance Management policy provides the option for certain categories of employees, (1) covering those returning from international assignments, (2) employees in developmental and rotational assignments, and (3) employees at risk and subject to layoff, to be placed directly in next assignments without use of the internal jobs posting system. Although Dr. Tighe met not just one, but all three of these categories, Mr. Gray inexplicably limited him to only applying for jobs posted on the online jobs system, straightjacketing him with just one job search approach – to apply impersonally online, from about 5,000 miles and five time zones away, and to hope for the best, while other peer and younger employees in the

US were being assigned to new roles (which Dr. Tighe was qualified for and interested in) through direct placement.

70.     Per its Performance Management policy, BAE Systems could have directly placed Dr. Tighe in any one of the almost two dozen jobs he applied to.  However, Mr. Gray, without any explanation to Dr. Tighe, had decided to avoid the use of this policy option and restricted Dr. Tighe to only use the jobs posting system, limiting Dr. Tighe's job placement possibilities.  This was not consistent with BAE Systems' contractual obligation to provide "every effort" to assist Dr. Tighe in securing a new position at BAE Systems, but was consistent with Mr. Gray's discriminatory comments, both verbal and in writing, about Dr. Tighe's limited future potential to the company.

71.     As Dr. Tighe utilized the internal jobs posting system as his only allowed means of researching and applying for US-based jobs, BAE Systems opted to fill at least nine positions (and likely more) for which he was well qualified as direct placements of other US-based executives, with the result that Dr. Tighe was unable to apply for them since he was strictly limited to applying for jobs that were posted on the internal jobs website (and none of these positions were posted there).  There are only two factors – Dr. Tighe's age and his location in the UK instead of the US – which distinguished him from the employees who benefited from a direct placement.  Since Dr. Tighe had made it very clear that he could return quickly to the US and could work anywhere in the US, it is clear that his age was the reason that he was not allowed to participate in direct placement for a new position.

72.     One specific example dealing with job posting versus direct placement is useful to illustrate the situation Dr. Tighe was placed in.  BAE Systems made the decision to move the incumbent in the VP of Operations for the Intelligence & Security Sector to a new leadership

role as President of the Land & Armaments Sector.  Rather than posting either job, both jobs were filled using the direct placement approach.  In prior pre-UK assignments, Dr. Tighe had provided significant management, engineering and business development support to the business unit which is now the I&S Sector, and was highly qualified to fill the vacant VP of Operations job, but did not have the opportunity to apply as this role was never posted.

73.      Dr. Tighe was excluded from the general process that would have allowed him to be considered as a direct-placement candidate for any positions being filled that were not placed on BAE Systems' jobs website, which he could have been eligible for according to BAE Systems' Performance Management policy.  When Dr. Tighe would express interest in a particular position, he was reminded that he was required to post for all positions – with no exceptions.  BAE Systems never once explained why they were limiting him just to post for positions and were excluding him from direct placement, ignoring the direct placement option in their own policy.

74.      BAE Systems' unwillingness to offer Dr. Tighe any direct placement job opportunities – despite his qualifications, ability to quickly return to the US, and work location flexibility – is in direct conflict with their contractual obligation to him to apply "every effort" to assist him in finding a US-based leadership position to return to.

75.      The fact that Dr. Tighe was limited to applying for jobs strictly through the posting system severely limited his options for finding a new position at BAE Systems, and is further evidence of BAE Systems pushing him out based on his age.

76.      For one job, which well matched Dr. Tighe's prior experience and present capabilities, and which was very appealing to him, the Chief Engineer of the Intelligence & Security Sector, and which Dr. Tighe was interviewed for but not selected, BAE Systems

ignored their own policy of giving current qualified employees who apply internally for open roles first priority before hiring externally.  In a prior assignment, Dr. Tighe had very successfully served as VP of Engineering for BAE Systems' Customer Solutions Operating Group, one element of which was the legacy business – BAE Systems IT, which is now the I&S Sector.  The Chief Engineer role in the I&S sector held less scope and responsibility that did his prior VP of Engineering role, yet Dr. Tighe was not considered competitive for this role. Following Dr. Tighe's rejection for this role, BAE Systems hired an external candidate to fill this Chief Engineer role.

77.     Further, when Dr. Tighe twice requested a short interval of paid leave (called "garden leave" in the UK) following his repatriation on June 30, 2013 in order to finally be US-based enabling him to much more effectively focus on his internal search for a US-based job with BAE Systems, he was told by senior BAE Systems Human Resources executives that the company did not have such a leave policy.

78.     "Garden leave" consists of a limited interval of continuing employment with full pay and benefits, but no specific assignment – which in Dr. Tighe's case would have enabled a full-time US-based internal job search for the duration of the leave.  Such garden leave has been granted to other BAE Systems employees in the past.  For example, Dr. Tighe knows that a Global Grade-17 executive returning to the US from a UK-based assignment about a year prior to Dr. Tighe's repatriation date was offered 60 days of paid leave, without this employee even asking for it, while he and his sector mutually searched for a next assignment for him.  Dr. Tighe's home sector, the S2 Sector, not only did not offer him such an interval of paid leave, but also rejected his two requests for such leave and did essentially nothing pro-actively to help in his job search before or after he repatriated. This lack of action and rejection of Dr. Tighe's

requests for paid leave to further his job search efforts once he was back in the US are additional evidence of the company's unwillingness to apply its "every effort" in helping Dr. Tighe find a new role, and of the discriminatory manner in which he was treated leading up to his involuntary termination in July 2013.

79.     Further, over the full 18 month interval of his internal job search, his home sector, S2, never offered him any meaningful or proactive internal job search assistance beyond a barely minimal level of effort – all of which was triggered by actions on the part of Dr. Tighe.  During two separate meetings which Dr. Tighe requested months before his repatriation, Dr. Tighe discussed his internal job search with Michelle Murphy, Vice President of Human Resources for Dr. Tighe's home sector (the S2 Sector) and Angela Souter, BAE Systems' Director of Global Mobility.  Rather than offering him meaningful "every effort" internal job search support, they both advised Dr. Tighe that there were no internal jobs available and that he should immediately begin an external job search campaign upon his return from the UK it was very unlikely there would be any job available to him internal to BAE Systems. This advice was given approximately six months prior to his repatriation.  Yet, despite this advice, he continued to find and apply for appropriate jobs which were posted by the company on its internal jobs posting website.

80.     In these meetings set up by Dr. Tighe, both Ms. Murphy and Ms. Souter also offered Dr. Tighe their assistance with their prior employers (Raytheon and Northrup Grumman) if he wanted them to intervene on his behalf external to BAE Systems.  Dr. Tighe did not accept their offers of assistance because he remained focused on finding an internal job, and continuing his career with BAE Systems until his planned retirement.  He found their focus on an external job search, rather than providing internal job search support, very frustrating and disappointing.

81.     Since BAE Systems excluded Dr. Tighe, without any explanation and inconsistent with their "every effort" contractual obligation, from eligibility for direct placement into a new position, refused to offer him any interval of paid leave for job search purposes once he repatriated, and at the very beginning of his job search locked him into strict use of the internal jobs posting systems, he was forced to look for a new US-based position with BAE Systems from overseas in the UK.  Over his 18 month job search, the 5,000 mile distance and five time zone difference made it very difficult for him to meet with people to discuss any new positions, be interviewed, and communicate his sincere interest in a particular position or convincingly communicate the range of experience and capabilities he could offer.  When it was feasible, he did return to the US for job search meetings which he arranged on his own – taking advantage of unrelated business trips and using his full 2013 vacation allotment for US-based job search activities – traveling and taking time off at his personal expense.  Even doing this, BAE Systems remained unwilling to offer him any US-based job to return to.

**BAE's Contractual Obligations**

82.     As stated, under an executed employment agreement with Dr. Tighe, BAE Systems had a contractual responsibility to provide their "every effort" to help Dr. Tighe find a returning job.  However, BAE Systems failed to provide Dr. Tighe with support beyond a barely minimal level of effort.  BAE Systems also blocked Dr. Tighe from direct placement options, which were optionally allowed by policy.  This severely and unfairly constrained his job search efforts and reduced the probability of finding an appropriate job to return to, or, in reality, any job whatsoever to return to.  The environment which BAE Systems created actively and passively hindered Dr. Tighe's job search efforts, resulting in his eventual involuntary termination.

83.     There is another startling example of failed efforts on the part of BAE Systems to support Dr. Tighe (provide him with their "every effort" contractual obligation) in finding a US-based job to return to. BAE Systems manages a range of internal services (IT support, proposal center management and human resources services) in an organizational entity called Enterprise Shared Services (ESS) Sector. In past executive level roles, Dr. Tighe as Program Manager successfully managed and upgraded complex global mission critical data networks and desktop environments for NASA and the National Reconnaissance Office (NRO). Also, he has extensive business development/proposal management experience, having over his career held a progressive range of leadership roles in helping to win approximately $10B in new business for his employers. In a job search meeting with Mr. Belair (BAE Systems' Senior Vice President for Planning and Strategy), which Dr. Tighe set up in late 2012, Mr. Belair in an unsolicited comment to Dr. Tighe characterized Dr. Tighe's business development skills as "the best in the company."

84.     This business development capability and his comprehensive IT/desktop program management experience should have made Dr. Tighe an excellent candidate for leadership positions in the ESS Sector. An initial email from Dr. Tighe to the ESS executives was positively received. Dr. Tighe then attempted to set up meetings with the president and deputy of the ESS Sector. Over an interval of at least two months, he received no response from either executive from his first two attempts. Dr. Tighe then surfaced this lack of response as a concern in person to Mr. Gray, who agreed the lack of any response was inappropriate, and told Dr. Tighe he would intervene for him. When Dr. Tighe then attempted a third time to set up a meeting with these executives, he again received no response. At this point in frustration, Dr. Tighe ceased his efforts to talk with the ESS leadership. The end result was that Dr. Tighe had no

opportunity to discuss his interests, skills and job possibilities with the ESS leadership, at a time when ESS was an area of the company needing the highly relevant and successful past experience he had to offer. Rather than demonstrate "every effort" to assist Dr. Tighe in finding a job, the ESS leadership demonstrated "no effort" – further reducing Dr. Tighe's probability of finding an internal job to return to.

85.     Pursuant to Dr. Tighe's employment agreement with BAE Systems, he was contractually entitled to participate in BAE Systems' Long Term Incentive Plan ("LTIP") executive bonus program for the duration of his international assignment as a Global Grade 17. This "entitlement" was explicitly included in an executed extension to his initial 2 year employment agreement. This entitlement could be eliminated only if the full LTIP program had been canceled for all of its executive participants. This was not the case – 2013 Spring LTIP grants were issued to Dr. Tighe's executive colleagues across the entire BAE Systems US company.

86.     The Spring LTIP grant is typically awarded in March of each year. Dr. Tighe was not awarded a 2013 Spring grant in March, despite his contractual entitlement to receive it. Several months after the fact, and only because Dr. Tighe inquired, he was informed by Mr. Gray that it was BAE Systems' practice for someone who was returning from an international assignment, and who had not yet secured another position, to be eliminated from the Spring Long-Term Incentive Plan (LTIP) award.

87.     However, the nomination process for the Spring LTIP grant is finalized no later than the beginning of the calendar year. Since Dr. Tighe was not scheduled to return from his assignment until June 30, 2013, BAE Systems evidently made the decision to exclude him from the Spring grant up to six months before his return – and well in advance of many of his job

applications being made and reviewed by the US company. Apparently, BAE Systems had decided, as early as December 2012, not to hire Dr. Tighe for a new position once he repatriated well before Dr. Tighe had even applied for most of those positions.

88.     Disappointingly, no one communicated BAE Systems' decision to remove him from the Spring LTIP grant to Dr. Tighe in advance of the grant date.  With no advance notice, Dr. Tighe did not have any opportunity to challenge the decision until months after the equivalent grants had been made to his peer executives. In an attempt to close this issue, and after Dr. Tighe's involuntary termination, BAE Systems paid an unsolicited pro-rated cash amount in lieu of the share-based LTIP award to Dr. Tighe as a "good-will" gesture.

89.     Dr. Tighe is aware that a year earlier, an executive at his Global Grade-17 returned from a similar multi-year UK-based assignment without a next assignment defined and was awarded his full Spring 2012 LTIP grant. This directly contradicts Mr. Gray's statement to Dr. Tighe that a standard practice was applied when BAE Systems withheld the Spring 2013 LTIP grant from him, and indicates that BAE Systems' actions respecting Dr. Tighe's LTIP grant were both discriminatory and in breach of their contract with Dr. Tighe.

## COUNT ONE

### DISCRIMINATION IN EMPLOYMENT IN VIOLATION OF THE ADEA
**(against BAE Systems Technology Solutions & Services, Inc. and BAE Systems, Inc.)**

90.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

91.     BAE Systems discriminated against Dr. Tighe due to his age.  BAE Systems created an extended pattern of discrimination, covering a set of nearly two dozen positions he applied for, including the Vice President of Internal Audit at BAE Inc. and the S2 Sector Global Grade at BAE TSS, as well as the 18 Deputy positions described above. BAE Systems was

consistently unwilling to place Dr. Tighe in a US-based role even after more than 18 months of job applications, or even to interview him for a majority of the almost two dozen US-based internal positions he applied for. As a result, he did not obtain a new US-based position with BAE Systems following his repatriation on June 30, 2013, and was involuntarily terminated from BAE Systems on July 8, 2013, with resulting severe financial damage regarding back pay and front pay – causing significant damage to Dr. Tighe's future financial security once he fully retires in July 2018. But for his advanced age, these events would not have occurred.

92.    Indeed, BAE Systems had apparently decided (though Dr. Tighe did not know at the time) at least six months before Dr. Tighe's scheduled return to the US (in June 2013) that it did not intend to re-employ him at the end of his UK assignment. This decision showed that, no matter how many positions Dr. Tighe applied for and was well qualified to assume, BAE Systems did not intend to re-employ him upon his return to the US due to a perceived lack of "future assignment potential" for someone of his age.

93.    BAE Systems, through its agents and officers, discriminated against Dr. Tighe on account of his age, in failing to assist him in any meaningful way in finding a new position at BAE Systems, limiting his options for new employment with BAE Systems and making it more difficult for him to apply for new positions at BAE Systems, failing to hire him for a new position at BAE Systems, and ultimately terminating him as a result, as described above, based on his age, well over 40.

94.    This discrimination was with respect to Dr. Tighe's compensation, terms, conditions, and privileges of employment, and constituted a violation of the Age Discrimination in Employment Act of 1967, as amended.

95.     BAE Systems engaged in these discriminatory practices willfully, within the meaning of Section 4(b) of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623(b).

96.     As a direct and proximate result of this discrimination, Dr. Tighe has suffered and continues to suffer injury including past and future loss of income and benefits of employment, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses, and other injuries.

97.     Due to the severity and willfulness of BAE Systems' conduct, Dr. Tighe is also entitled to liquidated damages under the ADEA.

## COUNT TWO

### BREACH OF CONTRACT
**(against BAE Systems Technology Solutions & Services, Inc. and BAE Systems, Inc.)**

98.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

99.     In addition to age discrimination, BAE Systems also breached its contract with Dr. Tighe by failing to make "every effort" to assist him in finding a new position at BAE Systems at the conclusion of his UK assignment, and by not paying him the Spring 2013 LTIP grant to which he was entitled, as described above.

100.     As a direct and proximate result of this breach, Dr. Tighe has suffered and continues to suffer economic injury including past and future loss of income and benefits of employment, other past pecuniary losses, and future pecuniary losses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff DOUGLAS R. TIGHE requests that this Court enter judgment in his favor and against the Defendants, BAE SYSTEMS TECHNOLOGY SOLUTIONS & SERVICES, INC. and BAE SYSTEMS, INC. on the above Counts One and Two, and further:

a) Award Dr. Tighe appropriate front and back pay, benefits, pecuniary losses, pre-judgment interest, and post-judgment interest on Count One; and in addition

b) Award Dr. Tighe liquidated damages and attorney's fees and costs on Count One, including the costs and fees of experts; and in addition

c) Award Dr. Tighe all allowable contract damages on Count Two, plus pre-judgment and post-judgment interest on Count Two; and in addition

d) Award Dr. Tighe all other costs of this action as may be permitted by law; and in addition

e) Award Dr. Tighe such other and further relief as may be appropriate under the circumstances.

March 11, 2015                           Respectfully submitted,


                                         ___/s/ Carla D. Brown_____
                                         Carla D. Brown
                                         cbrown@cbcblaw.com
                                         Bar No. 17836
                                         Peter C. Cohen
                                         pcohen@cbcblaw.com
                                         *Pro Hac Vice*
                                         Victoria K. Clarke
                                         vclarke@cbcblaw.com
                                         *Pro Hac Vice*
                                         CHARLSON BREDEHOFT
                                           COHEN BROWN & JONES, P.C.
                                         11260 Roger Bacon Drive, Suite 201
                                         Reston, Virginia 20190
                                         (703) 318-6800 Telephone
                                         (703) 318-6808 Facsimile

                                         *Counsel for Plaintiff,*
                                         *Douglas R. Tighe*