## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DR. DOUGLAS R. TIGHE                          :
                                              :
                                              :
     v.                                        :   Civil No. CCB-14-2719
                                              :
                                              :
BAE SYSTEMS TECHNOLOGY                        :
SOLUTIONS & SERVICES INC., et al.             :

## <u>MEMORANDUM</u>

The plaintiff, Dr. Douglas R. Tighe, alleges the defendants, BAE Systems Technology

Solutions & Services Inc. ("TSS") and BAE Systems, Inc. ("BSI"), discriminated against him in

violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34.  In

particular, Dr. Tighe alleges the defendants did not hire him for senior-level positions at TSS and

BSI because of his age.  Pending before the court is the defendants' motion for summary

judgment.  (Mot. Summ. J., ECF No. 43).  The court finds oral argument unnecessary to resolve

the issues.  *See* Local R. 105.6 (D. Md. 2014).  For the reasons that follow, the defendants'

motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

Dr. Tighe was employed by BAE[1] from 2004 until 2013.  In 2009, Dr. Tighe relocated to

the United Kingdom for a temporary assignment with BAE Systems, plc. (Mot. Summ. J., Ex. 1,

Tighe Dep. 20:16–21:6, ECF No. 43-2).  Originally a two-year rotation, Dr. Tighe's assignment

was extended until July of 2013.  *Id.* at 43:19–22.

---

[1] "BAE" comprises many entities.  BAE Systems, plc is a company based in the United Kingdom.  BSI is
a United States subsidiary of BAE Systems, plc.  TSS is a subsidiary of BSI. (Mem. Supp. Mot. Summ. J.
1, ECF No. 43-1).

BAE does not guarantee employment upon return from overseas assignments.  (Mot. Summ. J., Ex. 9, Letter Dated May 20, 2009 at 3, ECF No. 43-10).  Prior to his return from the United Kingdom, Dr. Tighe applied for various jobs with BAE.  (Tighe Dep. 49:17–21, ECF No. 43-2).  Throughout this process, Dr. Tighe met and corresponded with Curtis Gray, BSI's Senior Vice President of Human Resources. *Id.* at 49:22–50:15, 264:16–265:7.  Mr. Gray reached out to senior BAE leadership and human resources personnel in an attempt to help Dr. Tighe obtain suitable employment.  (Mot. Summ. J., Ex. 2, Gray Dep. 40:7–41:16, ECF No. 43-3; Ex. 17, Email Dated Oct. 27, 2011, ECF No. 43-18).

This case is about two positions for which Dr. Tighe applied and ultimately was not selected: Vice President, Internal Audit at BSI ("the Audit Position") and Vice President and Deputy General Manager in the Support Solutions Sector ("S2"), a division of TSS ("the Deputy Position").  Either position would have been a promotion for Dr. Tighe, who was 66 at the time he was not selected for the Audit Position and 67 at the time he was not selected for the Deputy Position. (Opp'n Mot. Summ. J. 1, ECF No. 47).

*The Audit Position*

The Audit Position was posted to BAE's internal system on October 22, 2012. (Opp'n Mot. Summ. J., Ex. 2, Email Dated October 22, 2012, ECF No. 47-1).  It was a "24 month rotational position" and a "senior leadership team" job that reported directly to the CEO of BSI. (Opp'n Mot. Summ. J., Ex. 3, Vice President – Internal Audit Job Posting, ECF No. 47-1). Thirteen BAE employees, including Dr. Tighe, applied for the position. (Opp'n Mot. Summ. J., Ex. 5, Defs.' Answers Interrogs. 13–15, ECF No. 47-1).  Nine applicants, including Dr. Tighe, were selected for a first round of interviews with a hiring panel. *Id.*  The hiring panel ultimately declined to include Dr. Tighe in the "down-select," a term the parties use to denote the process

by which two finalists proceeded to a final interview with Linda Hudson, the CEO of BSI.  The

two finalists, Debra Maxwell (age 45) and Nick Ruscio (age 38), were selected on January 4,

2013.  (Gray Dep. 220:1–221:13, ECF No. 43-3; Defs.' Answers Interrogs., ECF No. 47-1).  Mr.

Gray informed Dr. Tighe by email that he was not included in the down-select:

> We have concluded the down-select process for the Internal Audit role.
> Unfortunately you were not selected to proceed in the process.  You did a fine job
> in the interview so there was no issues there.  IF [sic] we were only filling the
> Internal Audit role, I think you would have made the down-select.  But, as you
> know this is a developmental rotational assignment, so we have to fill this role
> and factor in a view as to what the next role would be. We interviewed ten
> qualified candidates from throughout the Inc business and had to differentiate
> somehow – and future assignment potential was as [sic] tie breaking factor. I am
> sorry this did not work and am happy to discuss it further.

(Opp'n Mot. Summ. J., Ex. 12, Email Dated January 7, 2013, ECF No. 47-2).  Mr. Ruscio was

ultimately selected to fill the Audit Position. (Opp'n Mot. Summ. J., Ex. 31, Letter Dated

January 14, 2013, ECF No. 47-4).

Dr. Tighe and Mr. Gray subsequently met to discuss why he was not included in the

down select. (Opp'n Mot. Summ. J., Ex. 32, Meeting Notice, ECF No. 47-4).  The parties do not

agree on what was said at that meeting.  Dr. Tighe asserts that Mr. Gray stated "there were ten

qualified candidates and the tie-breaking factor was this lack of future potential."  He also reports

the following conversation:

> Dr. Tighe: "[D]id I stay in the UK too long, was it an out of sight, out of mind
> situation where people didn't remember me and remember my qualifications?"
>
> Mr. Gray: "[N]o, Doug, it's really an out of sight, out of phase situation."

(Tighe Dep. 123:15–22, ECF No. 43-2).

When later pressed to explain what he meant by the phrase "future assignment potential,"

Mr. Gray indicated the comment was in reference to the Audit Position being "a developmental

assignment . . . the reasonableness of the job leading to a known next job was, in fact, a tie

breaking factor." (Gray Dep. 234:10–22, ECF No. 43-3).  That is, he claims Dr. Tighe provided

an unsatisfactory answer when asked to identify a next role for which the Audit Position would

prepare him, and this caused him to be excluded from the down-select.  *Id.* at 171:19–172:15.

During the interview, Dr. Tighe purportedly responded with "a comprehensive answer,"

identifying "an executive level job in line management . . . that [he] would be interested in a

business unit lead . . . in any of the other three sectors . . . [or something] in the business

development area . . . [or an] engineering VP [role]." (Tighe Dep 77:17–80:14, ECF No. 43-2).

He "closed that part of the discussion by telling [Mr. Gray] that [he would] be willing at the end

of the two years [in the Audit Position] to take whatever company job best served the interests of

the company at that time."  *Id.*

Debra Maxwell, one of the finalists, answered that "she wanted to get into business

leadership like a business area leader or ultimately sector president. . . . [H]er answer . . . was one

of the business area leaders . . . like a VP, GM." (Gray Dep. 174:10–14, ECF No. 43-3).  Nick

Ruscio, the other finalist, answered "very specifically . . . [that he] wants to be on a path to either

sector level or [BSI] level financial leadership . . . either CFO [or] VP of finance for a sector."

*Id.* 172:17–22.

*The Deputy Position*

The Deputy Position was a senior-level position reporting directly to Erin Moseley,

President of S2.  The job opening was posted on April 10, 2013, (Opp'n Mot. Summ. J., Ex. 37,

Email Dated April 10, 2013, ECF No.47-4), and TSS received over 250 applications. (Mot.

Summ. J., Ex. 23, List of Applicants, ECF No. 43-24)  Dr. Tighe initially was selected for an

interview; however, a panel never materialized and Dr. Tighe instead met with Ms. Moseley on

May 29, 2013, to discuss the Deputy Position. (Opp'n Mot. Summ. J., Ex. 35, Moseley Dep.

28:22–32:6, ECF No. 47-4).  During this conversation, Dr. Tighe mentioned that he could fill the position for several years as he was not planning on retiring for five to seven years (he was 67 at the time). *Id.* at 32:20–34:19.  In response to these statements, Ms. Moseley purportedly commented on the "short runway" Dr. Tighe had left at BAE.  *Id.*  Ms. Moseley indicated this comment would have been in reference to Dr. Tighe's future retirement, though she does not necessarily believe five to seven years constitutes a "short runway."  *Id.*

After this conversation, Dr. Tighe had no further meetings or interviews regarding the Deputy Position.  In his correspondence with Michelle Murphy, Vice President of Human Resources at TSS, Dr. Tighe was informed that TSS was not currently moving forward with filling the Deputy Position and that it would consider him for an interview when the company decided to move forward. (Opp'n Mot. Summ. J., Ex. 49, Email Dated June 19, 2013, ECF No. 47-5).  As a result of not obtaining a suitable position with BAE, Dr. Tighe was terminated on or about July 8, 2013, upon the expiration of his contract. (Opp'n Mot. Summ. J., Ex. 68, Email Dated July 02, 2013, ECF No. 47-7).

Notwithstanding its representations to Dr. Tighe, TSS continued to review potential candidates from within BAE, including Cheryl Labombard-Paradis.  (Opp'n Mot. Summ. J., Ex. 81, Email Dated July 17, 2013, ECF No. 47-9).  After having to reschedule, Ms. Labombard-Paradis was set to interview for the Deputy Position on July 30, 2013. (Opp'n Mot. Summ. J., Ex. 88, Email Dated July 23, 2013, ECF No. 47-9).  On July 26, 2013, TSS's Chief Counsel, Douglas Coleman, received two letters from Dr. Tighe's counsel informing him of potential legal claims Dr. Tighe may have against BAE.  (Opp'n Mot. Summ. J., Exs. 92, 93, Letters Dated July 25, 2013, ECF No. 47-10).  Ms. Lombard-Paradis's July 30 interview was subsequently cancelled.  In an email dated August 1, 2013, Ms. Murphy informed others involved in the hiring

5

process that the Deputy Position had been put on hold while S2 worked on a reorganization plan.

(Mot. Summ. J., Ex. 35, Email Dated August 1, 2013, ECF No. 43-36).  Ultimately, no one was

ever interviewed for the position.  Instead, Brad Jacobs (age 56 at the time), the Chief Financial

Officer of BSI, was recruited to fill a Deputy Position at S2 with responsibilities significantly

greater than those advertised for the original Deputy Position. (Mot. Summ. J., Ex. 5, Jacobs

Dep. 15:1–17:8, ECF No. 43-6; Ex. 108, Email Dated November 6, 2013, ECF No. 47-11).  Mr.

Jacobs reported that the S2's "financial situation was worse than anticipated."  (Jacobs Dep.

32:14–20, ECF No. 43-6).  Mr. Jacobs ultimately returned to BSI after S2 dissolved.  *Id.* at 44:3–

13.

**ANALYSIS**

**I.     Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party*

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit

under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment."  *Anderson*, 477

U.S. at 247–48.  The court must view the evidence in the light most favorable to the nonmoving

party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable

inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see*

6

*also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

## II.      Audit Position

Under the ADEA, a plaintiff must "demonstrate that the employer engaged in disparate treatment because of the employee's age and, accordingly, age must be the but-for cause of such treatment." *EEOC v. Baltimore Cnty.*, 747 F.3d 267, 273 (4th Cir. 2014) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)) (internal quotation marks omitted). There are two methods by which a plaintiff can prove age was the but-for cause of an adverse employment action: "either by direct evidence of discriminatory animus . . . or through the indirect burden-shifting proof scheme set forth in *McDonnell Douglas Corp. v. Green,*411 U.S. 792, 802 [ ] (1973)." *Sagar v. Oracle Corp.*, 914 F. Supp. 2d 688, 694 (D. Md. 2012) (citations omitted), *aff'd,* 523 F. App'x 999 (4th Cir. 2013).  Dr. Tighe has not produced direct evidence of discrimination; however, he has made a sufficient showing under the *McDonnell Douglas* framework for his Audit Position claim to survive summary judgment.

### a.  *Direct Evidence*

Direct evidence is evidence that, if believed, "would prove the existence of a fact . . . without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (internal quotation marks and citation omitted), *rev'd on other grounds by* 517 U.S. 308 (1996).  "The evidence must 'clearly indicate[ ] a discriminatory attitude at the workplace and must illustrate a nexus between the negative attitude and the employment action.'" *Pilger v. D.M. Bowman, Inc.*, 833 F. Supp. 2d 489, 494 (D. Md. 2011) (quoting *Hill v.*

*Lockheed Martin Logistics Mgmt., Inc.*, 314 F.3d 657, 665 (4th Cir. 2003)), *aff'd,* 521 F. App'x

307 (4th Cir. 2013).  Dr. Tighe contends two statements by Mr. Gray constitute direct evidence

of discrimination:[2] (1) Mr. Gray's email stating that Dr. Tighe was not included in the down-

select because of "future assignment potential," and (2) his later comment that Dr. Tighe was not

selected because he was "out of sight, out of phase."

These are not the type of statements typically accepted by courts as constituting direct

evidence of discrimination.  Standing alone, neither explicitly references Dr. Tighe's age.  Each

interview candidate was asked about possible future assignments.  The phrase "future assignment

potential" could thus refer to either Dr. Tighe's answer to that question or to his age.

Accordingly, the phrase is sufficiently ambiguous as to not constitute direct evidence of age-

based discrimination.  Similarly, assuming Mr. Gray said Dr. Tighe was "out of phase," this

vague phrase (even in light of the comment on future assignment potential) would require a

factfinder to make presumptions and draw inferences before concluding Mr. Gray acted with

discriminatory intent.  Accordingly, these statements are not direct evidence of discrimination,

and the court will proceed with the *McDonnell Douglas* analysis.

### b.  McDonnell Douglas *Framework*

Where, as in this case, there is no direct evidence of discrimination, a plaintiff may

proceed under the *McDonnell Douglas* framework.   Under this framework, Dr. Tighe must first

make out a *prima facie* case of discrimination. If he succeeds, "he creates a presumption of

discrimination, and the burden of production shifts to the defendant to articulate a legitimate,

non-discriminatory reason for its adverse employment decision." *Laber v. Harvey*, 438 F.3d 404,

430 (4th Cir. 2006). Once the defendant provides a reason, the presumption of discrimination

---

[2] As an initial matter, the court—not the jury, as the plaintiff's brief may imply—makes the legal
determination of whether certain evidence constitutes "direct evidence" of discrimination.

vanishes, and the burden shifts back to the plaintiff to demonstrate that the given reason was a pretext for unlawful discrimination. *Id.*

A plaintiff may establish a *prima facie* case by showing "that: (1) he was a member of a protected class, *i.e.*, that he was at least 40 years old; (2) his employer had an open position for which he applied and was qualified; (3) he was rejected despite his qualifications; and (4) the position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff, whether within or outside the class protected by the ADEA." *Id.* The defendants concede that Dr. Tighe has established a *prima facie* case as to the Audit Position. (Mem. Supp. Mot. Summ. J. 24, ECF No. 43-1).

The defendants have articulated legitimate nondiscriminatory reasons for not selecting Dr. Tighe for the Audit Position. First, the two candidates included in the down-select, Mr. Ruscio and Ms. Maxwell, provided more satisfactory and specific answers when asked to identify what role(s) with BAE (s)he could assume after the Audit Position. Additionally, they contend Mr. Ruscio ultimately was selected for the position because of his extensive financial background and experience with BSI's ethics department (which allowed him to incorporate that department under his leadership once he assumed the Audit Position).

The burden thus shifts back to Dr. Tighe to show that the defendants' legitimate rationales were simply pretext masking their discriminatory intent. "To do so, the plaintiff must do more than simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of age. In some cases, however, proof that the employer's reason is false is sufficient to show age discrimination when combined with the plaintiff's prima facie case." *Laber*, 438 F.3d at 430–31 (4th Cir. 2006) (citation omitted).

There is sufficient evidence in the record to create a genuine dispute as to whether the defendants' proffered nondiscriminatory reasons for not selecting Dr. Tighe were false.  For example, a reasonable jury could conclude that Dr. Tighe's answer to the interview question about future assignments was comparable to Ms. Maxwell's, such that his answer to the interview question was not the true reason he was excluded from the down-select.  Similarly, the factfinder should determine the meaning of the phrases "future assignment potential" and "out of phase" (if Mr. Gray is found to have said the latter).  A reasonable jury could conclude either (1) the comments reflect an impermissible assumption that because he was older, Dr. Tighe had less potential to take on future assignments or (2) the phrase "future assignment potential" referenced Dr. Tighe's answer to the interview question.  Accordingly, summary judgment is not appropriate, and Dr. Tighe's Audit Position claim may proceed to trial.

**III.    Deputy Position**

Dr. Tighe also claims the defendants violated the ADEA by not hiring him for the Deputy Position.  He argues direct evidence of discrimination should preclude summary judgment.  In the alternative, he seeks the same result under the *McDonnell Douglas* framework.  Both arguments fail, and the defendants' motion for summary judgment will be granted as to the Deputy Position.

*a.  Direct Evidence*

Dr. Tighe has not produced direct evidence of discrimination.  He alleges that he was removed from consideration for the Deputy Position after a conversation with Ms. Moseley in which she commented on Dr. Tighe's "short runway" at BAE.[3]  Ms. Moseley made the comment in response to Dr. Tighe's assertion that he planned to retire in five to seven years.  Even if Ms.

---

[3] There appears to be a dispute as to whether Ms. Moseley actually made this comment.  For the purposes of ruling on the defendants' summary judgment motion, the court assumes she did.

Moseley were motivated by Dr. Tighe's retirement plans, such a consideration would be permissible because Dr. Tighe's age and his retirement plans are analytically distinct. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610–11 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'"). "'When the employer's decision is wholly motivated by factors other than age, . . . [e]ven if the motivating factor is correlated with age,' that decision is not contrary to the ADEA." *Denio v. Asplundh Tree Expert Co.*, No. 95-1904, 1996 WL 423125, at *3 (4th Cir. July 30, 1996) (quoting *Hazen*, 507 U.S. at 611).[4]   Ms. Moseley was not impermissibly treating age as a proxy and assuming Dr. Tighe would retire; rather, her comment was in response to Dr. Tighe's direct assertion that he would retire in five years. *Cf. Hilde v. City of Eveleth*, 777 F.3d 998, 1006 (8th Cir. 2015) ("Using retirement eligibility to presuppose lowered productivity or dedication would not 'represent an *accurate* judgment about the employee' unless evidence other than age indicates that the employee would, in fact, retire."). Ms. Moseley's statement does not clearly indicate impermissible consideration of Dr. Tighe's age and is therefore not direct evidence of discrimination.

**b. McDonnell Douglas *Framework***

The parties dispute whether Dr. Tighe can establish a *prima facie* case of age discrimination.  In particular, the defendants claim Dr. Tighe was never rejected in regards to the Deputy Position, and therefore the third factor of the *prima facie* test cannot be met.[5]  They posit

---

[4] Unpublished cases are cited only for the soundness of their reasoning, not for any precedential value.

[5] As noted above, the third factor is whether "he was rejected despite his qualifications." *Laber*, 438 F.3d at 430 (4th Cir. 2006).  The court refers to this as the "third factor" because it reflects the formulation the Fourth Circuit articulated in an ADEA failure-to-hire case. *See id.*  In other iterations of the *McDonnell Douglas* framework, the rejection component is incorporated into the fourth factor. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) ("To prove a *prima facie* case of discriminatory refusal to promote

the Deputy Position was never filled, and Mr. Jacobs filled a different position when he transferred to TSS in November of 2013.  Dr. Tighe claims Mr. Jacobs actually filled the same Deputy Position for which he applied.  Even accepting Dr. Tighe's presentation of the facts, this claim cannot survive summary judgment.

Although the evidence may suggest that Ms. Moseley intended to exclude Dr. Tighe from the interview and selection process, that process never came to fruition.  The record shows that not a single applicant was interviewed for the Deputy Position.  Instead, the position was filled by the lateral hiring of Mr. Jacobs, who was specifically recruited from his post as CFO of BSI and granted significant additional job responsibilities beyond those assigned to the original Deputy Position.  An applicant has not been rejected when the employer abandons completely the hiring process and instead hand-picks someone outside of the applicant pool to fill the position.  *See Hackney v. Perry*, No. 97-2055, 1998 WL 801490, at *2 (4th Cir. Nov. 18, 1998) ("Because the lateral transfer did not involve a promotion for [the person hired], competitive selection was not required. Thus, [the plaintiff's] application was not considered, and thus, he was not rejected within the meaning of *McDonnell Douglas*.").  Dr. Tighe cannot establish a *prima facie* case of discrimination.

Even assuming he could establish a *prima facie* case, Dr. Tighe has not shown that the defendants' proffered explanation for hiring Mr. Jacobs—namely, that S2 was in financial distress and needed his expertise—was pretext.  Dr. Tighe relies mainly on assumptions drawn from the timing of his lawyer's correspondence with TSS's general counsel.  The only other evidence proffered to challenge the defendants' explanation was that Mr. Jacobs was not initially

---

under [*McDonnell Douglas*], plaintiff must prove that (1) plaintiff is a member of a protected group; (2) plaintiff applied for the position in question; (3) plaintiff was qualified for the position; and (4) plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." (internal quotation marks and citation omitted)).

informed of S2's financial condition when he was first offered the job.  This is insufficient to show pretext, particularly considering that Mr. Jacobs reported already having knowledge of S2's financial situation through his role as BSI's CFO and that S2's financial condition ended up being worse than he had anticipated.  No reasonable jury could conclude based on the record before the court that TSS declined to hire Dr. Tighe because of his age.  Accordingly, the court will grant the defendants' motion for summary judgment as to the Deputy Position.

## CONCLUSION

For the reasons discussed above, the defendants' motion will be granted in part and denied in part.  Dr. Tighe may proceed to trial against BSI on his claim of age discrimination as it pertains to the Audit Position, but judgment will be granted for TSS.

A separate order follows.


April 19, 2016
Date

_____/S/_____
Catherine C. Blake
United States District Judge